Jil Mazer-Marino, Esq.
Meyer, Suozzi, English & Klein, P.C.
990 Stewart Avenue, Suite 300
Post Office Box 9194
Garden City, New York 11530
Telephone: (516) 741-6565
Email: jmazermarino@msek.com

*Attorneys for Yoga Smoga, Inc., the Alleged Debtor*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:

**YOGA SMOGA, INC.,**

                         Alleged Debtor.
-----------------------------------------------------------X

Chapter 7

Case No. 16- 13159 (MJW)


# ALLEGED DEBTOR'S MEMORANDUM OF
# LAW IN SUPPORT OF MOTION TO DISMISS

MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
990 Stewart Avenue, Suite 300
Post Office Box 9190
Garden City, New York 11530
Telephone: (516) 741-6565
Email: jmazermarino@msek.com

*Attorneys for Yoga Smoga, Inc., the Alleged Debtor*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ............................................................................. ii

PRELIMINARY STATEMENT ........................................................................1

BACKGROUND FACTS ..................................................................................2

ARGUMENT .....................................................................................................3

    A.  Applicable Law Under Section 303 of the Bankruptcy Code.............................3

    B.  None of the Petitioning Creditors Have Established a
        Prima Facie Case that No Bona Fide Dispute Exists ........................................5

        i.  The Moore Investors' Claims Are Subject to Bona Fide Dispute ................5

        ii.  Durga's and the Ravi Trust's Claims are Subject to Dispute
           Because They Are Capital Contributions ...............................................11

    C.  The Involuntary Petition Must Be Dismissed Because it was
        Filed in Bad Faith..............................................................................................12

        i.  Legal Standards for Dismissal of an Involuntary Petition
          for Bad Faith ...........................................................................................12

        ii.  This Case was Filed in Bad Faith Considering the Totality
          of the Circumstances...............................................................................14

    D.  This Court Should Abstain from this Case Which is an
        Intra-Company Management Dispute.................................................................18

    E.  The Alleged Debtor Should Be Awarded Fees, Costs
        And Damages Under Section 303(i) ..................................................................19

        i.  The Alleged Debtor Should be Awarded Fees and
          Costs Under Section 303(i)(1) ................................................................19

        ii.  The Alleged Debtor Should be Awarded Damages
          Under Section 303(i)(2) ..........................................................................21

CONCLUSION.................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adell v. John Richards Home Building Co. (In re John Richards Home Building Co.)*,
439 F.3d 248 (6th Cir. 2006) ....................................................................................12

*In re Adelphia Comm'ns Corp.*,
365 B.R. 24 (Bankr. S.D.N.Y. 2007) ......................................................................8, 9

*In re Aminian*,
Case No. 07-12957, 2008 WL 793574 (Bankr. S.D.N.Y. 2008) ...............................3

*Bartmann v. Maverick Tube Corp.*,
853 F.2d 1540 (10th Cir. 1988) .................................................................................4

*Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*,
269 F.3d 726 (6th Cir. 2001) .....................................................................................9

*In re BDC 56 LLC*,
741 F.3d at 119.n.5 ....................................................................................................5

*In re Better Care, Ltd.*,
97 B.R. 405 (Bankr. E.D. Pa. 1989) ........................................................................16

*In re Bock Transp., Inc.*,
327 B.R. 378 (8th Cir. BAP 2005).........................................................................12

*In re Busick*,
831 F.2d 745 (7th Cir. 1987) .....................................................................................4

*Crest One SpA v. TPG Troy, LLC (In re TPG Troy, LLC)*,
793 F.3d 228 (2d Cir. 2015)............................................................................. *passim*

*In re Diamondhead Casino Corp.*,
2016 WL 3284674 (Bankr. D. Del. June 7, 2016)................................13, 14, 15, 16

*In re Elverson*,
492 B.R. 831 (Bankr. E.D. Pa 2013) .........................................................................3

*In re Fax Station, Inc.*,
118 B.R. 176 (Bankr. D. R.I. 1990) ........................................................................18

*In re Forever Green Athletic Fields, Inc.*,
804 F.3d 328 (3d Cir. 2015).............................................................................12, 14

*Gen. Trading v. Yale Materials Handling Corp.*,
119 F.3d 1485 (11th Cir. 1997) ...........................................................12

*Matter of Inv. Corp. of North Am.*,
39 B.R. 758 (Bankr. S.D. Fla 1984)......................................................18

*Key Mechanical Inc. v. BDC 56 LLC (In re BDC 56 LLC)*,
330 F.3d 111 (2d Cir. 2003), *abrogated on other grounds by In re Zarnel*, 619
F.3d 156 (2d Cir. 2010).....................................................................3, 5

*Lubrow Machine co. v. Bayshore Wire Products Corp. (In re Bayshore Wire*
*Products Corp)*,
209 F.3d 100 (2d Cir. 2000)........................................................ *passim*

*In re Mountain Dairies, Inc.*,
372 B.R. 623 (Bankr. S.D.N.Y. 2007) ...................................................20

*Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH*
*S&B Holdings)*,
420 B.R. 112 (Bankr. S.D.N.Y. 2009) .....................................................8

*In re Petro Fill, Inc.*,
144 B.R. 26 (Bankr. W.D. Pa. 1992) ......................................................18

*Rimell v. Mark Twain Bank (In re Rimell)*,
946 F.2d 1363 (8th Cir. 1991) ...............................................................4

*Riverview Trenton R.R. Co. v. DSC Ltd.*,
486 F.3d 940, 945 (6th Cir.  2007) ..........................................................4

*In re Silverman*,
230 B.R. 46 (Bankr. D.N.J. 1998) ..........................................................22

*In re Skyworks Ventures, Inc.*,
431 B.R. 573 (Bankr. D.N.J. 2010) ....................................................20, 22

*In re Soderberg & Schafer CPAS LLC*,
441 B.R. 262 (Bankr. N.D. Ohio 2010) ....................................................5

*In re Stillwater Asset Backed Offshore Fund Ltd.*,
485 B.R. 498 (Bankr. S.D.N.Y. 2013) .....................................................4

*In re Taub*,
439 B.R. 261 (Bankr. E.D.N.Y. 2010).....................................................4

*In re U.S. Optical, Inc.*,
991 F.2d 792 (4th Cir. 1993) ................................................................12

*Matter of Win-Sum Sports, Inc.*,
    14 B.R. 389 (Bankr. D. Conn. 1981) ......................................................................18

**Statutes**

8 Del. C. §§ 211, 220, 225 ..............................................................................................15

Bankruptcy Code Section 303 ...............................................................3, 19, 20, 21, 22

Bankruptcy Code Section 305(a)(1) .............................................................................18

**Other Authorities**

Fed. R. Bankruptct R. Rule 9011 ............................................................................17, 21

9 *Collier on Bankruptcy* ¶ 303.11
    (Alan N. Resnick & Henry J. Sommers eds. (16th ed.))............................................3

**TO THE HONORABLE MICHAEL E. WILES,**
**UNITED STATES BANKRUPTCY JUDGE:**

Yoga Smoga, Inc., the alleged debtor ("**YS**" or the "**Alleged Debtor**"), by its undersigned attorneys, submits this Memorandum of Law in support of its Motion to Dismiss the Involuntary Chapter 7 Petition, filed against the Alleged Debtor by Durga Capital LLC ("**Durga**"), The Ravi Singh 2015 Family Trust (the "**Ravi Trust**"), Jon Thomas Moore, Ryan James Moore, Jeffrey Stevens Moore, and Lori Lynne Walsh (collectively, the "**Moore Investors**" and together with Durga and the Ravi Trust, the "**Petitioning Creditors**"), and respectfully sets forth as follows:

## PRELIMINARY STATEMENT

The Involuntary Petition must be dismissed because each of the Petitioning Creditors' claims is subject to a bona fide dispute. The claims of the Moore Investors are disputed as to both liability and amount. Those claims are based on investments in YS made pursuant to non-binding term sheets providing for the Moore Investors to buy equity at a discount and there are no agreed upon terms concerning their repayment. In addition, the Moore Investors' claims, even if purportedly denominated as debt, are subject to recharacterization as capital contributions. Similarly, Durga and the Ravi Trust, the two remaining Petitioning Creditors, are entities controlled by Ravi Singh ("**Ravi**") and their claims are based on promissory notes issued when Ravi was an officer and director of YS and aware that YS was in need of cash infusions. As discussed in detail below, Durga's and the Ravi Trust's claims are in dispute because they are subject to recharacterization as contributions to equity or equitable subordination based on breaches of contract and fiduciary duty by Ravi. Accordingly, Durga and the Ravi Trust are not creditors at all but investors holding equity in YS.

1

Further, this involuntary case must be dismissed because it was filed in bad faith as evidenced by, among other things, an October 7, 2016 email from Ravi to a subset of YS investors that are friendly to him that states, in part:

> "HOWEVER, getting to the good news, because of the expiring loans, the debt holders (essentially me) are able to file on November 1rst [*sic*] to take over the entire company once those loans are officially in default."

At the time the email was sent, Ravi was an officer and director of YS. The use of the bankruptcy process to effectuate a change of management, to further shareholder rights as opposed to creditor rights, or for a petitioning creditor's disproportionate gain, or in furtherance of a former officer's and director's breach of fiduciary duties owed to the alleged debtor, all constitute bad faith warranting the dismissal of this case.

Moreover, the involuntary petition is but a tactic being used by the Petitioning Creditors to resolve an intracompany dispute as to management and bankruptcy courts abstain from involuntary cases filed for that purpose.

Accordingly for the reasons set forth above and below, the Involuntary Petition must be dismissed.

## BACKGROUND FACTS

All relevant facts are set forth in the *Declaration of Rishi Bali in Support of the Motion of the Alleged Debtor to Dismiss the Involuntary Petition* (hereinafter, the "**Rishi Bali Decl.**")[1] and the *Declaration of Tapasya Bali in Support of the Motion of the Alleged Debtor to Dismiss the Involuntary Petition* (hereinafter, the "**Tapasya Bali Decl.**"), each filed contemporaneously herewith.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed in the Rishi Bali Decl.

**ARGUMENT**

**A.     Applicable Law Under Section 303 of the Bankruptcy Code**

Section 303(b)(1) of the Bankruptcy Code provides, in pertinent part:

> An involuntary case . . . is commenced . . . . (1) by three or more
> entities, each of which is either a holder of a claim against such
> person *that is not* contingent as to liability or *the subject of a bona
> fide dispute as to liability or amount* . . . .

11 U.S.C. § 303(b)(1) (emphasis added).

The rationale for excluding the holders of claims subject to bona fide disputes from

acting as petitioning creditors is that:

> Limiting qualifying claims to those not subject to bona fide dispute
> was an attempt to balance the interests of debtors and creditors in
> involuntary cases.  If creditors with clearly disputed claims could
> initiate an involuntary filing, they could improperly use the
> involuntary process (or threat of it) to extort either payment or at
> least favorable resolution of a bona fide dispute from a debtor.
> Moreover, as some courts have noted, Congress wanted creditors
> to settle disputed claims outside of bankruptcy, given the serious
> adverse impact of an involuntary petition on an alleged debtor.

9 *Collier on Bankruptcy* ¶ 303.11 (Alan N. Resnick  & Henry J. Sommer eds. (16th ed.)).

Therefore Bankruptcy Code section 303 requires that a petitioning creditor's claim must be

certain as to both liability and amount.  *In re Elverson*, 492 B.R. 831, 842 (Bankr. E.D. Pa 2013).

*See In re Aminian*, Case No. 07-12957, 2008 WL 793574, *2 (Bankr. S.D.N.Y. 2008) (stating, as

to the test for qualifying as petitioning creditor under 11 U.S.C. § 303(b)(i), that "[a] creditor

must satisfy both prongs of this test; the claim must not be subject to a bona fide dispute as to

*either* liability *or* a dispute as to amount") (italics in original).

The Second Circuit has adopted an objective test in determining whether there exists a

bona fide dispute regarding a petitioning creditor's claim.  *Crest One SpA v. TPG Troy, LLC (In*

*re TPG Troy, LLC)*, 793 F.3d 228, 234 (2d Cir. 2015); *Key Mechanical Inc. v. BDC 56 LLC, (In*

*re BDC 56 LLC)*, 330 F.3d 111, 117-18 (2d Cir. 2003), *abrogated on other grounds by In re*

*Zarnel*, 619 F.3d 156 (2d Cir. 2010). Thus, in determining whether there is a bona fide dispute regarding a petitioning creditor's claim, "[a] court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt." *TPG Troy, LLC*, 793 F.3d at 234 (citing *In re BDC 56 LLC*, 330 F.3d 111, 117 (2d Cir. 2003)) (internal quotation marks omitted). *See Riverview Trenton R.R. Co. v. DSC Ltd.)*, 486 F.3d 940, 945 (6ᵗʰ Cir. 2007) (creditor should not be eligible to serve as petitioning creditor if a legitimate factual or legal basis exists for alleged debtor not paying the debt); *In re Taub*, 439 B.R. 261, 271 (Bankr. E.D.N.Y. 2010) (same).

In applying the objective standard "[t]he court's objective is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute." *Rimell v. Mark Twain Bank (In re Rimell)*, 946 F.2d 1363, 1365 (8th Cir. 1991) (citations and quotations omitted). *See TPG Troy, LLC*, 793 F.3d at 235 ("The job of the court when considering the question is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute.") (internal citations omitted); *In re Stillwater Asset Backed Offshore Fund Ltd.*, 485 B.R. 498, 505 (Bankr. S.D.N.Y. 2013) ("While a court is called upon to determine the presence of a bona fide dispute, it is not called on to resolve such dispute. This does not preclude a court, however, from addressing the merits of a dispute, and it 'may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists.") (internal citations omitted); *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1544 (10th Cir. 1988) ("The court need not determine the probable outcome of the dispute, but merely whether one exists."); *In re Busick*, 831 F.2d 745 (7th Cir. 1987) ("[t]he statute does not require the court to determine the outcome of any dispute, only its presence or absence. Only a limited analysis of the claims at issue is necessary.") (internal citations omitted).

The Second Circuit, like other circuits, "requires, first that the petitioning creditor establish a prima facie case that no bona fide dispute exists. Once a prima facie case has been established, the burden shifts to the debtor to demonstrate the existence of a bona fide dispute." *BDC 56 LLC,* 330 F.3d at 118 (citing *Subway Equip. Leasing Corp. v. Sims (In re Sims))*, 994 F.2d 210, 221 (5th Cir. 1993); *In re Soderberg & Schafer CPAS LLC*, 441 B.R. 262, 264 (Bankr. N.D. Ohio 2010).

Because courts are merely ascertaining whether a dispute exists, rather than actually resolving a dispute, a court is not required to conduct an evidentiary hearing to conclude that a claim is in bona fide dispute. *TPG Troy LLC*, 793 F.3d at 235 (referencing *In re BDC 56 LLC*, 741 F.3d at 119.n.5).

### B. None of the Petitioning Creditors Have Established a Prima Facie Case that No Bona Fide Dispute Exists

An attachment to the involuntary petition states that the nature of the Petitioning Creditor's claims is "unsecured debt." *See* Involuntary Petition [Dkt. No 1]. There are no promissory notes, invoices, or other documents or instruments included with the involuntary petition establishing the Petitioning Creditors' claims. Therefore, the Petitioning Creditors have failed to establish that they have claims in the first instance, much less satisfy their burden of establishing a prima facie case that no bona fide dispute exists respecting such claims.

### i. The Moore Investors' Claims Are Subject to Bona Fide Dispute

The Moore Investors' claims are subject to bona fide dispute because the Moore Investors invested in YS without a binding agreement concerning the consideration they would receive from YS in return. The claims are also subject to dispute because the Moore Investors' investments in YS are capital contributions not debt.

As set forth more fully in the Rishi Bali Decl., YS anticipated closing on a transaction with Bain Capital and the Family Office of Paul Tudor Jones that was expected to raise between $35 and $40 million. Rishi Bali Decl., ¶ 18. In July 2016, those transactions were still on track to close in early August 2016 but YS needed additional financing to fund the company until the Bain transaction closed. Rishi Bali Decl., ¶ 31. The Moore Investors invested $125,000 each into YS to enable them to purchase equity in YS at a 25% discount once the Bain transaction closed. Rishi Bali Decl., ¶ 22.

The funds invested by the Moore Investors were invested in YS in connection with non-binding Term Sheets. Rishi Bali Decl at ¶ 7. Although the Term Sheets provide the Moore Investors with the option to treat their investments as debt that matures on October 31, 2016, those options are not enforceable based on the plain language of the Term Sheets. In that regard, each of the non-binding Term Sheets state:

> This term sheet is an expression of intent only, does not express the agreement of the parties, is not meant to be binding on the parties, and is meant to be used as a negotiation aid by the parties. The parties do not intend to be bound until they enter into definitive agreements regarding the subject matter of this term sheet.

Each Term Sheet further states:

> This term sheet is non-binding and is intended solely as a summary of the terms that are currently proposed by the parties. The parties acknowledge that they neither intend to enter, nor have they entered, into any agreement to negotiate a definitive agreement pursuant to this term sheet, and either party may, at any time prior to execution of such definitive agreement, propose different terms from those summarized herein or unilaterally terminate all negotiations pursuant to this term sheet without any liability whatsoever to the other party.

Copies of the Term Sheets are annexed to the Rishi Bali Decl. as **Exhibit** D. The non-binding Term Sheets are the only agreements between YS's management and the Moore Investors

memorializing the investments by the Moore Investors. Rishi Bali Decl., ¶ 24. YS has not executed promissory notes in favor of any of the Moore Investors or entered into any other agreements (definitive or otherwise) with the Moore Investors concerning the repayment of those investments. Rishi Bali Decl., ¶ 24.

YS entered into non-binding Term Sheets with four other investors, which term sheets were substantially identical to the Term Sheets executed by the Moore Investors. Rishi Bali Decl., ¶ 25. The proposed bridge financing from the Jones Family Office did not contemplate treatment of their investment as debt; rather, any notes issues to the Jones Family Office would convert automatically to equity at maturity. Rishi Bali Decl., ¶ 26.

After the collapse of the Bain transaction on or about August 1, 2016, it was apparent that YS could not agree to the terms set forth in the non-binding Term Sheets, and Tapasya and Rishi developed alternative terms to propose to the investors, including permitting the investors to treat their investments as debt but with an extended maturity date or requiring the investors to take Series B preferred shares in consideration of their investments in YS. Tapasya Bali Decl., ¶ 16. Moreover, Tapasya specifically informed Ravi that YS should not grant individual investors the option of treating their investments as debt because that agreement would empower individual investors to plunge YS into bankruptcy. Tapasya Bali Decl., ¶ 16, Ex. A.

Simply put, there was never an agreement by YS to treat the Moore Investors' investments, or any of the other investments, as debt payable on October 31, 2016. Tapasya Bali Decl., ¶ 17; Rishi Bali Decl., ¶ 30. Further, none of the investors, including the Moore Investors, should have expected to be repaid on October 31, 2016 if the Bain transaction collapsed because YS would not have had available cash to make payment. Rishi Bali Decl, ¶ 28. Moreover, the only investors that are seeking to enforce the non-binding Term Sheet as debt are the Moore Investors. Rishi Bali Decl., ¶ 29. None of the other investors that signed non-binding Term

Sheets have made demand for payment or have otherwise attempted to treat their investments as debt.[2] Rishi Bali Decl., ¶ 29.

Moreover, if the Term Sheets were enforceable (and they are not), the Moore Investors would not be entitled to collect their "loan" because the indebtedness purportedly owed to the Moore Investors is subject to recharacterization as equity.

Recharacterization of debt as equity "is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*." *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings)*, 420 B.R. 112, 157 (Bankr. S.D.N.Y. 2009). Recharacterization focuses on the substance of the transaction rather than on the form. *In re Adelphia Comm'ns Corp.*, 365 B.R. 24, 73 (Bankr. S.D.N.Y. 2007). Generally, courts consider the following eleven factors in determining whether claims are disguised capital contributions:

> (a) the names given to the instruments, if any, evidencing the indebtedness;
>
> (b) the presence or absence of a fixed maturity date and schedule of payments;
>
> (c) the presence or absence of a fixed rate of interest and interest payments;
>
> (d) the source of repayments;
>
> (e) the adequacy or inadequacy of capitalization;
>
> (f) the identity of interest between the creditor and the stockholder;
>
> (g) the security, if any, for the advances;
>
> (h) the corporation's ability to obtain financing from outside lending institutions;

---

[2] Sean Gallagher, another friend of Ravi, invested $500,000 into YS without any documentation. On or about November 1, 2016, Mr. Gallagher also delivered a demand to YS for repayment of his investment. The Moore Investors and Ravi also made demand for payment on November 1, 2016. Rishi Bali Decl., **Exhibit** G.

> (i) the extent to which the advances were subordinated to the claims of outside creditors;
>
> (j) the extent to which the advances were used to acquire capital assets; and
>
> (k) the presence or absence of a sinking fund to provide repayments.

*In re Adelphia Comm'ns Corp.*, 365 B.R. at 74. "No one factor is controlling or decisive," and a court must consider the "particular circumstances of each case." *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 747-48 (6th Cir. 2001).

An analysis of the factors set forth above evidence that the Moore Investors' claims should be recharacterized as equity, specifically:

- The Moore Investors could only be repaid at the October 31, 2016 maturity date if YS was successful in its next capital raise. Rishi Bali Decl., ¶ 31.

- The Moore Investors invested in YS when it was undercapitalized and was not expected to have sufficient capital to conduct normal operations until the Bain transaction closed. Rishi Bali Decl., ¶ 31.

- There is a strong identity of interest between the Moore Investors and YS. James Moore is Ravi's friend and was introduced by Ravi to YS. Rishi Bali Decl., ¶ 31.

- There was no security or sinking fund to repay the purported debt. Rishi Bali Decl., ¶ 31.

- YS had tried to obtain financing from outside lending institutions, who were dealing with YS at arms' length, and was unsuccessful. Rishi Bali Decl., ¶ 31.

The following additional facts particular to this case further evidence that the Moore Investors' claims are contribution to capital.

The economics of the transaction evidence the Moore Investors' investment in YS was intended to be a contribution to capital. Collecting the debt at the maturity date set forth in the Term Sheet would yield the Moore Investors with only a nominal benefit because the non-binding Term Sheets provide for interest at six percent per annum with a maturity date of less than 120 days -- the investors would receive less than $2,500 in interest at maturity. Rishi Bali Decl., ¶ 32. In contrast, if the Bain transaction closed, each of the Moore Investors would be entitled to purchase equity securities at a price that was 25% less than what Bain would pay – a 33% return on investment in less than four months. Rishi Bali Decl., ¶ 32.

As importantly, if the Bain transaction did not close, YS would not have had the financial wherewithal to repay the Moore Investors. Rishi Bali Decl., ¶ 33. The funds invested by the Moore Investors were used (and were intended to be used) to fund YS's operations pending the consummation of the Bain transaction. Rishi Bali Decl., ¶ 33. At that time, YS had not yet achieved profitability. Rishi Bali Decl., ¶ 33. Accordingly, absent a capital raise, there was no real possibility of repaying the Moore Investors. Rishi Bali Decl., ¶ 33.

Further, providing the "debt option" in the non-binding Term Sheets was Ravi's contrivance and YS's corporate counsel advised that the "debt option" is inconsistent with deals of this nature. Rishi Bali Decl., ¶ 34. In contrast, the note purchase agreement that was being negotiated between YS and the Family Office of Paul Tudor Jones, an experienced lender that was negotiating with YS at arms' length, did not include a provision entitling the investor to treat the cash infusion as debt. Rishi Bali Decl., ¶ 34.

After the Bain transaction collapsed, neither Rishi nor Tapasya could have caused YS to agree to repay the Moore Investors as of the October 31, 2016 maturity date contemplated by the Term Sheets because YS did not have the funds to do so. Rishi Bali Decl., ¶ 36; Tapasya Bali Dec., ¶ 16. Indeed, in October 2016, Tapasya advised Ravi that the agreements with the

10

investors, including the Moore Investors, could not include the "debt option" described in the Term Sheets and YS should agree to a note with an extended maturity date or a note that automatically converted to equity securities. Tapasya Bali Dec., ¶ 16, Ex. A. In that same email, Tapasya expressed her concern that investors should not have the option to treat the investment as debt stating "[w]e will need [every investor outside the Series B capital raise to] consent to the decision [to treat the investment as debt] otherwise any singular person can trigger a bankruptcy event." Tapasya Bali Dec., ¶ 16, Ex. A.

Based on all of the foregoing, there is an objective basis for this Court to find that the claims of the Moore Investors are subject to a bona fide legal dispute as to both amount and liability. Therefore, the Moore Investors do not have standing to be petitioning creditors.

Without the Moore Investors, there would be only two remaining petitioning creditors – Durga and the Ravi Trust. YS has more than 12 creditors excluding insiders and employees. Rishi Bali Dec., ¶ 35. Accordingly, the involuntary petition must be dismissed because there is a bona fide dispute as to the Moore Investors' claims.

ii.     **Durga's and the Ravi Trust's Claims are Subject to**
        **Dispute Because They Are Capital Contributions**

Similar to the Moore Investor's claims, Durga's and the Ravi Trust's claims should be recharacterized as equity because a majority of the "recharacterization factors are present here:

- There is a strong identity of interest between Durga and the Ravi Trust on one hand and YS on the other hand. At the time YS issued the notes to Durga and the Ravi Trust (the "**Ravi Notes**"), Ravi was (a) the sole member of Durga; (b) controlled the Ravi Trust; and (c) was Chairman of YS and Director of Finance. Rishi Bali Dec., ¶ 37.

- YS was undercapitalized and could only repay the Ravi Notes if YS was successful in its next capital raise. Rishi Bali Dec., ¶ 37.

- Durga and the Ravi Trust invested in YS when it was undercapitalized and was not expected to have sufficient capital to conduct normal operations until the Bain transaction closed. Rishi Bali Dec., ¶ 37.

- There was no security or sinking fund to repay the Ravi Notes. Rishi Bali Dec., ¶ 37.

- YS had tried to obtain financing from outside lending institutions and was unsuccessful. Rishi Bali Dec., ¶ 37.

Based on the foregoing facts and the applicable law described above, there is an objective basis for this Court to find that there is either a factual or a legal dispute as to each of the Petitioning Creditors' claims. This Court need not resolve such disputes in favor of the Alleged Debtor for this Involuntary Petition to be dismissed, rather the existence of the disputes themselves constitute grounds for this Court to dismiss the Involuntary Petition.

C. **The Involuntary Petition Must Be Dismissed Because it was Filed in Bad Faith**

i. **Legal Standards for Dismissal of an Involuntary Petition for Bad Faith**

A petitioning creditor's bad faith is cause to dismiss an involuntary petition. *See In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 333 (3d Cir. 2015); *In re Bock Transp., Inc.*, 327 B.R. 378, 381 (8th Cir. BAP 2005). *Cf. Lubrow Machine co. v. Bayshore Wire Products Corp. (In re Bayshore Wire Products Corp)*, 209 F.3d 100, 105 (2d Cir. 2000); *In re U.S. Optical, Inc.*, 991 F.2d 792, at *3 (4th Cir. 1993); *Adell v. John Richards Home Building Co. (In re John Richards Home Building Co.)*, 439 F.3d 248, 254 (6th Cir. 2006); *Gen. Trading v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1502 (11th Cir. 1997).

In *Bayshore*, the Second Circuit Court of Appeals identified the legal standards used to determine whether a case is filed in bad faith stating:

> "[C]ourts have used different approaches to determine whether a petition was filed in bad faith [for purposes of § 303(i)(2)]. Some courts have used an "improper use" test, which "finds bad faith when a petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a 'disproportionate advantage' for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum." Other courts have applied an "improper purpose" test, where bad faith exists if the filing of the petition was motivated by ill will, malice, or a desire to embarrass or harass the alleged debtor. A third line of cases employs an objective test for bad faith based on "what a reasonable person would have believed." Finally, as the Eleventh Circuit has observed, a number of courts have sought to model the bad faith inquiry on the standards set forth in Bankruptcy Rule 9011.

*Bayshore*, 209 F.3d at 105 (internal citations omitted). *See also In re Diamondhead Casino Corp.*, 2016 WL 3284674, *16 (Bankr. D. Del. June 7, 2016). The Second Circuit has not opined on which standard is the correct standard. *Bayshore*, 209 F.3d at 106.

Most recently, the Third Circuit Court of Appeals adopted the "totality of the circumstances" test as the standard for determining whether an involuntary is filed in bad faith, reasoning:

> This standard is most suitable for evaluating the myriad ways in which creditors filing an involuntary petition could act in bad faith. It also is the same standard we apply when reviewing allegations that a debtor filed a voluntary petition in bad faith. In conducting this fact-intensive review, courts may consider a number of factors, including, but not limited to, whether: the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a

tactical advantage in pending actions; the filing was used as a
substitute for customary debt-collection procedures; and the filing
had suspicious timing.

*Forever Green Athletics*, 804 F.3d at 336 (internal citations omitted).

The involuntary petition filed against YS was filed in bad faith regardless of the standard

applied.

ii. **This Case was Filed in Bad Faith Considering the
Totality of the Circumstances**

Considering all relevant facts and circumstances, this case was filed in bad faith because:

- Ravi admits that this involuntary bankruptcy case was commenced to effectuate a
change in management, which, as set forth more fully below, is, in and of itself,
bad faith.

- The case is a substitute for customary debt collection procedures and the
Petitioning Creditors have not availed themselves of the collection remedies
available under non-bankruptcy law.

- None of the Petitioning Creditors hold claims that are undisputed as to liability or
amount.

- The Petitioning Creditors either failed to make a reasonable inquiry concerning
the efficacy of their claims and the propriety of commencing an involuntary
petition to change management or acted in disregard of the facts and the law.

- The Petitioning Creditors used this filing to obtain a disproportionate advantage
for themselves *vis a vis* the other equity holders in the case.

In *In re Diamondhead Casino Corp.*, Case No. 15-11647, 2016 WL 3284674 (Bankr. D.

Del. June 7, 2016), the Delaware Bankruptcy Court held that filing an involuntary petition

primarily to effectuate a change in management is improper and grounds to dismiss for bad faith.

*Id.* at *22. In *Diamondhead*, petitioning creditors were noteholders and stockholders. *Id* at *1.

Prior to the involuntary bankruptcy case, certain shareholders obtained an order from the

Delaware Chancery Court compelling the alleged debtor's board of directors to call an annual

meeting. *Id* at *3. At the annual meeting, one of the future petitioning creditors solicited to

remove and replace the alleged debtor's incumbent board; however, the incumbent board was re-

14

elected.  *Id*.  An involuntary petition was filed less than two months after the annual meeting.  *Id*.
at *17.  Applying the totality of the circumstances test, the *Diamondhead* court held that the
petition was filed in bad faith on the grounds that the case was commenced to effectuate a
change in management and as a collection device, stating:

> [t]he Petitioning Creditors' primary concern in filing the
> involuntary petition was to effect a change in management to
> benefit their investments as stockholders.  The Court finds this not
> to be a proper purpose for filing an involuntary bankruptcy
> petition.  A secondary concern was to collect on their notes.  While
> it may be proper in some circumstances for noteholders to band
> together to file an involuntary bankruptcy petition, it is not
> appropriate here, where the noteholders are looking to vindicate
> their equity interests and where myriad state law remedies are
> available.

*Id*. at *22.  Additionally, although the *Diamondhead* court did not find that the petitioning
creditors were seeking an advantage over other creditors, the court found that the petitioning
creditors acted in bad faith because they attempted to gain an advantage over other shareholders
because the commencement of the case was an attempt to upend the results of the shareholder
vote.  *Id*.

Like *Diamondhead*, this case was filed for the improper purpose of effectuating a change
in management – Ravi's October 7, 2016 email states that the case will permit him to "take over
the company."  *See* Rishi Bali Decl., ¶ 40, Ex. I.  Indeed, an involuntary petition was filed only
weeks after the maturity date on the Ravi Notes.  Because YS is a Delaware company, Ravi and
the other Petitioning Creditors that are shareholders have a myriad of state law rights designed to
protect their equity interests, including the right to inspect the books and records and to call an
annual meeting to elect management.  *See* 8 Del. C. §§ 211, 220, 225.  None of the Petitioning
Creditors have availed themselves of remedies available to creditors under non-bankruptcy law
except for delivering demand notices. Rishi Bali Dec., ¶ 29.

Like *Diamondhead*, this case will advantage Ravi over the other preferred and common shareholders. As stated in Ravi's October 7, 2016 email, the involuntary case will result in all equity being wiped out; however, Durga and the Ravi Trust, which are each controlled by Ravi would be positioned to receive a distribution on their notes (which were issued while Ravi was Chairman of the YS board and Director of Finance). Rishi Bali Decl., ¶ 37. In addition, Ravi maneuvered so that he would have the inside track to buy the assets from a chapter 7 trustee by using YS's employees and proprietary information in his bid to control the company for his benefit both prior to and after his resignation as Chairman of the YS Board of Directors, which is a breach of Ravi's duty of loyalty to YS as well as a breach of the Employee Proprietary Information and Inventions Agreement ("**PIIA**"). Rishi Bali Decl., ¶¶ 12, 42, Ex. B.

Like *Diamondhead*, the Petitioning Creditors are seeking to use the Bankruptcy Code to collect their debts notwithstanding that there are adequate debt collection remedies available at state law.

This case differs from *Diamondhead* only in that in this case there are <u>additional</u> indicia of bad faith. For example, in this case, the claims of the Petitioning Creditors are disputed as to liability and amount and the Petitioning Creditors knew or should have known that they lacked standing to commence an involuntary petition.

The facts set forth above also constitute bad faith under all of the legal standards identified by the Second Circuit Court of Appeals in *Bayshore*.

Under the "improper use" test, commencing an involuntary case to effectuate a change in management of the alleged debtor constitutes bad faith. *See In re Better Care, Ltd.,* 97 B.R. 405, 411-13 (Bankr. E.D. Pa. 1989) (involuntary bankruptcy case was filed in bad faith because the petitioning creditor attempted to wrest control of the debtor corporation from the company's co-

owner and when the co-owner did not accede petitioning creditor's demands, the petitioning creditor commenced the involuntary bankruptcy proceeding to gain control).

Under the "objective test" the involuntary petition would be deemed to be a bad faith filing because it is not objectively reasonable for the Moore Investors to have believed that they had standing to be petitioning creditors nor would it be objectively reasonable for Ravi to believe that he could commence an involuntary case to gain control of YS, co-opt YS employees and steal proprietary information to further that goal in violation of his fiduciary duties and contractual obligations under the PIIA.

This case would also constitute bad faith under the "Rule 9011 standard":

> An analysis under Rule 9011 inquires into "a significant objective requirement bearing on the legal justification of a claim or defense: a reasonable inquiry into the facts and the law." In addition to requiring an objective inquiry, Rule 9011 requires a subjective inquiry as well: the bankruptcy proceeding cannot have been interposed for an improper purpose, "such as to harass, to cause delay, or to increase the cost of litigation."

*Bayshore*, 209 F3d. at 106 (quoting *General Trading Inc.*, 119 F.3d at 1502). In this case, none of the Petitioning Creditors appear to have made reasonable inquiry concerning whether the Moore Investors, Durga or the Ravi Trust had standing to bring this case and the case was commenced for the improper purpose of wresting control of the Alleged Debtor from existing management.

Based on the foregoing, the involuntary petition should be dismissed because it was filed in bad faith.

**D. This Court Should Abstain from this Case Which is an Intra-Company Management Dispute**

Section 305(a)(1) of the Bankruptcy Code provides, in relevant part:

> The court, after notice and a hearing, may dismiss a case under this title or may suspend all proceedings in a case under this title, at any time if – –

> (1) the interests of creditors and the debtor would be better served by such dismissal or suspension…

11 U.S.C. § 305(a)(1).

Bankruptcy courts abstain from hearing involuntary bankruptcy cases that are *de facto* disputes concerning management or ownership of a debtor and there is another forum that is addressing or can address the dispute. *See Matter of Inv. Corp. of North Am.*, 39 B.R. 758, 759 (Bankr. S.D. Fla 1984) (abstaining from bankruptcy case because petitioning creditor used bankruptcy court proceeding as alternative to pre-existing state court proceedings to resolve intra-company management and stockholder problems); *Matter of Win-Sum Sports, Inc.*, 14 B.R. 389, 394 (Bankr. D. Conn. 1981) (same); *In re Fax Station, Inc.*, 118 B.R. 176, 177-78 (Bankr. D. R.I. 1990) (abstaining from hearing dispute concerning ownership of business that was not attempt to use bankruptcy for orderly liquidation and distribution on creditor claims); *In re Petro Fill, Inc.*, 144 B.R. 26, 31 (Bankr. W.D. Pa. 1992) (dismissing involuntary bankruptcy case and stating that "a chapter 7 proceeding, is not to be regarded as a suitable alternative to dissolution of a deadlocked corporation . . . when [state court] remedy is available").

At best, this involuntary bankruptcy case is a dispute between Ravi on the one hand and Rishi and Tapasya on the other hand concerning the appropriate response to YS's liquidity issues.[3] Rishi Bali Dec., ¶ 44. Ravi advocates putting YS in a chapter 7 bankruptcy immediately while Rishi and Tapasya have proposed to continue to seek investors and, if unsuccessful to wind

---

[3] Albeit in reality, as set forth above, this case is not a good faith disagreement bur Ravi's attempt to wrest control of the company to benefit himself and a small group of investors friendly with Ravi . Rishi Bali Dec., ¶ 39.

down YS outside of bankruptcy. Rishi Bali Dec., ¶ 44. Further evidence that this involuntary case is nothing more than an intracompany management dispute is that the involuntary petition is not joined by any the other investors or any of the rank and file creditors, such as landlords or vendors.

Based on the foregoing, if this Court determines not to dismiss the involuntary petition, this Court should abstain from hearing this case.

### E. The Alleged Debtor Should Be Awarded Fees, Costs And Damages Under Section 303(i)

The involuntary proceeding is demonstrably frivolous and was filed in bad faith. Accordingly, the Court should award the Alleged Debtor (i) costs and attorney's fees under section 303(i)(1) of the Bankruptcy Code, and (ii) proximate and punitive damages under section 303(i)(2) of the Bankruptcy Code.

Section 303(i) of the Bankruptcy Code provides:

> If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment –
>
> i. against the petitioners and in favor of the debtor for--
>
>     (a)    costs; or
>     (b)    a reasonable attorney's fee; or
>
> ii. against any petitioner that filed the petition in bad faith, for--
>
>     (a)    any damages proximately caused by such filing; or
>     (b)    punitive damages.

11 U.S.C.§ 303(i).

### i. The Alleged Debtor Should be Awarded Fees and Costs Under Section 303(i)(1)

As noted by the Second Circuit:

> [A]n award of attorneys' fees and costs serves to discourage the filing of the involuntary petitions to force debtors to pay on a disputed debt. At bottom, section 303(i)(1) is a fee-shifting provision that requires no showing of bad faith, and aims to keep the putative estate whole.

*TPG Troy, LLC,* 793 F.3d at 235.

"[T]here is a presumption that costs and attorney's fees will be awarded to the alleged debtor following dismissal of an involuntary petition; and that the burden of proof in on the petitioner to justify a denial of costs and fees." *In re Mountain Dairies, Inc.*, 372 B.R. 623, 637 (Bankr. S.D.N.Y. 2007) (quoting *In re Squillante*, 259 B.R. 548, 553-54 (Bankr. D. Conn. 2001)). *See also TPG Troy, LLC,* 793 F.3d at 235; *In re Skyworks Ventures, Inc.*, 431 B.R. 573, 576 (Bankr. D.N.J. 2010) (awarding fees and costs is the "majority rule"). "Under the terms of the statute, bad faith is not a prerequisite to an award of costs and attorney's fees under § 303(i)(1)." *Bayshore* 209 at 100, 105.

In awarding costs and attorneys' fees, courts have adopted a totality of the circumstances test, considering the following factors: (1) the merits of the involuntary petition; (2) the role of any improper conduct on the part of the alleged debtor; (3) the reasonableness of the actions taken by the petitioning creditors; and (4) the motivation and objective behind the filing of the petition. *See TPG Troy, LLC,* 793 F.3d at 235 (citing *In re Taub,* 438 B.R. 761, 775 (Bankr. E.D.N.Y. 2010) (internal quotation marks omitted) (referencing 2 COLLIER ON BANKRUPTCY ¶ 303.11 (Alan N. Resnick & Henry J. Sommer eds. 16th ed.))).

Applying the factors set forth above, the Alleged Debtor is entitled to an award of its costs, attorneys' fees and damages under section 303(i) of the Bankruptcy Code. First, the involuntary petition is meritless because, *inter alia*, it is based on claims that are subject to bona fide dispute. Second, there is no improper conduct on the part of the Alleged Debtor. Third, the involuntary petition was filed by the Petitioning Creditors as a tactic to take over control of the

Alleged Debtor and the Petitioners Creditors acted unreasonably in both commencing the involuntary and burdening the Alleged Debtor with a meritless motion for the appointment of a trustee. Accordingly, the Alleged Debtor is entitled to costs and reasonable attorneys' fees consistent with section 303(i)(1) of the Bankruptcy Code.

### ii. The Alleged Debtor Should be Awarded Damages Under Section 303(i)(2)

Where, as in this case, an involuntary petition is filed in bad faith, the Court should order punitive damages against the petitioning creditors. 11 U.S.C. § 303(i)(2). As noted by the Second Circuit in *Bayshore*, 209 F.3d 100, "[b]ecause 'bad faith' is not defined in the [B]ankruptcy [C]ode, and because there is no legislative history addressing the intended meaning of this language, courts have used different approaches to determine whether a petition was filed in bad faith [for purposes of § 303(i)(2)]." *Bayshore*, 209 F.3d at 105 (brackets in the original and internal citations omitted). The *Bayshore* Court explained that Courts employ various standards, finding bad faith:

- "when a petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum," (so-called "improper use" test)

- "if the filing of the petition was motivated by ill will, malice, or a desire to embarrass or harass the alleged debtor," (so-called "improper purpose" test)

- "based on what a reasonable person would have believed," and

- under Bankruptcy Rule 9011 standards.

*Bayshore*, 209 F.3d at 105-06 (collecting cases) (citations and quotation marks omitted) (emphasis added).

Bad faith justifies an award of damages under section 303(i)(2) in this case because, as set

forth above, the Petitioning Creditors filed an involuntary bankruptcy petitions to take over the Alleged Debtor and wrest control of the Alleged Debtor with the assistance of the Bankruptcy Court and to leverage their position in relation to the Alleged Debtors' shareholders.

In fact, this is similar to filing an involuntary bankruptcy petition as a litigation tactic in a pending non-bankruptcy action, which courts have found to be improper and in bad faith, thus justifying award of damages under section 303(i)(2). *See for example In re Skyworks Ventures, Inc.*, 431 B.R. at 574 (finding that punitive damages would be awarded where the "petition was filed in bad faith in a two-party dispute as a litigation tactic"); *In re Silverman*, 230 B.R. 46, 53 (Bankr. D.N.J. 1998) ("The court concludes that [petitioning creditor] filed the petition with intent to harass [alleged debtor] and with knowledge that his claim was the subject of a bona fide dispute. He employed an improper litigation tactic, failed to conduct an adequate inquiry into [alleged debtor's] financial position and made false statements about the state court proceedings. A substantial award of punitive damages is therefore warranted.").

Accordingly, the Alleged Debtor respectfully requests that in any Order providing for dismissal of the involuntary petition, the Court either grants the Alleged Debtor such relief, or reserves jurisdiction to grant such relief to the Alleged Debtor. *See, e.g.*, *TPG Troy, LLC*, 793 F. 3d at 235-236 (the Second Circuit noted that when an involuntary petition is dismissed, there is a presumption that costs and attorney's fees will be awarded to the alleged debtor, and affirmed award of attorneys' fees upon dismissal of Involuntary Petition) (internal quotations and citations omitted).

In addition, the Alleged Debtor requests, pursuant to Bankruptcy Code section 303(e), that the Court require the Petitioning Creditors to file a bond to indemnify the Alleged Debtor for such amounts as the Court may later allow under Bankruptcy Code section 303(i).

## CONCLUSION

The Alleged Debtor respectfully requests an Order (a) dismissing the Involuntary Petition; (b) awarding the Alleged Debtor costs, attorneys' fees and punitive damages in an amount to be determined; and (c) granting such other and further relief as the Court deems proper.

Dated:     Garden City, New York
           December 5, 2016

                          MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

                          By:            */s/ Jil Mazer-Marino*
                                     Jil Mazer-Marino
                          990 Stewart Avenue, Suite 300
                          Post Office Box 9190
                          Garden City, New York 11530
                          Telephone: (516) 741-6565
                          Email: jmazermarino@msek.com

                          *Attorneys for Yoga Smoga, Inc., the Alleged Debtor*

1152394v.5